No. 08-35619

———————————————————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————————————————————

CELL THERAPEUTICS, INC.,
Appellant-Plaintiff

v.

THE LASH GROUP, INC., et al.
Appellees-Defendants
————————————————————————

Appeal from the United States District Court
for the Western District of Washington at Seattle
Honorable James L. Robart, United States District Judge

———————————————————————————————

**BRIEF OF APPELLANT
CELL THERAPEUTICS, INC.**

———————————————————————————————

Daniel J. Dunne
Paul F. Rugani
ORRICK, HERRINGTON & SUTCLIFFE LLP
719 Second Avenue, Suite 1000
Seattle, Washington 98104
Tel:   (206) 839-4300
Fax:   (206) 839-4301

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant states the following:

Appellant Cell Therapeutics, Inc. is a Washington corporation and is publicly held.  No corporation owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ....................................................................1

II.   STATEMENT OF JURISDICTION ......................................5

III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW .........................6

IV.  STATEMENT OF THE CASE ...............................................7

V.   STATEMENT OF FACTS .......................................................8

    A.   Overview of the Facts and Procedural Background.............................8

    B.   CTI and Its Contract with Lash ...........................................10

    C.   Lash Breaches Its Duties to CTI and Exposed CTI to Liability ........13

    D.   The Government Investigation and the Qui Tam Action...................15

    E.   The Proceedings Below and the District Court's Order of
        Dismissal ......................................................................18

VI.  SUMMARY OF THE ARGUMENT ..........................................20

VII. ARGUMENT......................................................................21

    A.   Standard of Review ..........................................................21

    B.   The District Court Erred in Entering Judgment of Dismissal on
        CTI's Claims for Contractual Indemnification and Negligence ........22

        1.   The FCA Does Not Bar Contractual Indemnification
            Claims ..................................................................22

        2.   This Court's Decision in *Mortgages* Does Not Require
            Dismissal of Contractual Indemnification Claims...................26

**TABLE OF CONTENTS**
**(continued)**

Page

a)    *Mortgages* Is Silent As to the Viability of Contractual Indemnification Claims..............................27

b)    There Are No Grounds for Applying a Federal Common Law Rule Barring Contractual Indemnification Claims .................................29

c)    Significant Factual Differences Between CTI's Case and *Mortgages* and Its Progeny Compel a Different Result Here......................................32

3.    Permitting CTI to Proceed with Its Claims Furthers the Policy Goals of the FCA ..........................................37

a)    Allowing Contractual Indemnification Claims Facilitates, Rather Than Inhibits, the Government's Recovery Efforts....................................38

b)    Contractual Indemnification Claims Do Not Enable Wrongdoers to Profit .........................................40

c)    Allowing CTI to Pursue Its Contractual Remedies Promotes the Public Policy in Favor of Enforcing Valid Contracts As Written ...........................................43

C.    The District Court Erred Because It Did Not Accept CTI's Factual Allegations and It Drew Inferences in Favor of the Moving Party ......................................................................44

D.    The District Court's Judgment Violated Due Process Because No Court Adjudged CTI to Have Violated the FCA ........................49

E.    The District Court Erred in Entering Judgment of Dismissal on CTI's Claims for Independent Business Damages That Are Permitted by *Madden* .......................................................................51

# **TABLE OF CONTENTS**
## **(continued)**

**Page**

F.     The District Court Erred by Dismissing the Complaint with Prejudice and Denying Leave to Amend ............................................55

VIII.   CONCLUSION................................................................................................57

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

**Page**

*Alaska Airlines, Inc. v. Brock*,
    480 U.S. 678 (1987)........................................................................25

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1990) ......................................................55

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007)........................................22

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)....................................................................31

*Burch ex rel. United States v. Piqua Eng'g, Inc.*,
    145 F.R.D. 452 (S.D. Ohio 1992)..............................................24

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)..............................................................25, 37

*Cort v. Ash*,
    422 U.S. 66 (1975)......................................................................28

*Deveraturda v. Globe Aviation Sec. Servs.*,
    454 F.3d 1043 (9th Cir. 2006) ...................................................22

*Doleman v. Meiji Mut. Life Ins. Co.*,
    727 F.2d 1480 (9th. Cir. 1984) .............................................48, 52

*Doyle v. Raley's Inc.*,
    158 F.3d 1012 (9th Cir. 1998) ...............................................21, 45

*Employees of Dep't of Pub. Health & Welfare, Mo. v. Dep't
    of Pub. Health & Welfare, Mo.*,
    411 U.S. 279 (1973)....................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES
### (continued)

Page

*Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*,
132 F.3d 526 (9th Cir. 1997) ...................................................................... *passim*

*Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*,
394 U.S. 404 (1969).........................................................................41, 42, 43, 50

*Foman v. Davis*,
371 U.S. 178 (1962)...........................................................................................55

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) .............................................................................55

*Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.*,
342 U.S. 282 (1952)...........................................................................................43

*Heart Doctors, P.S.C. v. Layne*,
Civ. No. 6:05-636, 2006 WL 2692694 (E.D. Ky. Sept. 13, 2006).....................33

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ...........................................................................55

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ...........................................................................55

*McSherry v. Capital One FSB*,
236 F.R.D. 516 (W.D. Wash. 2006) ...................................................................28

*Mortgages, Inc. v. United States District Court*,
934 F.2d 209 (9th Cir. 1991) ...................................................................... *passim*

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679, 688 (1978)...................................................................................31

## TABLE OF AUTHORITIES

### FEDERAL CASES
### (continued)

Page

*N. Star Steel Co. v. Thomas*,
515 U.S. 29 (1995)...........................................................26

*Pinter v. Dahl*,
486 U.S. 622 (1988).........................................................37

*Rental Dev. Corp. of Am. v. Lavery*,
304 F.2d 839 (9th Cir. 1962) ...............................................56

*Tenney v. Brandhove*,
341 U.S. 367 (1951)..........................................................25

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)......................................................30, 31

*United States ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) .............................................47

*United States ex rel. Madden v. Gen. Dynamics Corp.*,
4 F.3d 827 (9th Cir. 1993) ......................................... *passim*

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
505 F. Supp. 2d 20 (D.D.C. 2007)..................................34, 38, 52

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
779 F. Supp. 1252 (N.D. Cal. 1991)..................................34, 38

*United States ex rel. Pub. Integrity v. Therapeutic Tech., Inc.*,
895 F. Supp. 294 (S.D. Ala. 1995) .................................32, 38, 39

*United States v. Dynamics Research Corp.*,
441 F. Supp. 2d 259 (D. Mass. 2006)......................................33

## TABLE OF AUTHORITIES

### FEDERAL CASES
**(continued)**

Page

*United States v. Hero*,
   No. 78 Civ. 4587, 1981 WL 1982 (S.D.N.Y. July 27, 1981) .............................33

*United States v. Kennedy*,
   431 F. Supp. 877 (C.D. Cal. 1977) .............................................................33, 40

*United States v. Mead*,
   426 F.2d 118 (9th Cir. 1970) ......................................................................41, 47

*United States v. Nardone*,
   782 F. Supp. 996 (M.D. Pa. 1990)..............................................................32, 40

*United States v. Northrop Corp.*,
   59 F.3d 953 (9th Cir. 1995) ...............................................................................28

*United States v. Warnings*,
   No. CIV. A. 93-4541, 1994 WL 396432 (E.D. Pa. July 26, 1994) ....................33

*Wheeldin v. Wheeler*,
   373 U.S. 647 (1963)............................................................................................30

### STATE CASES

*Central Wash. Refrigeration, Inc. v. Barbee*,
   946 P.2d 760 (Wash. 1997) ................................................................................28

*Cont'l Cas. Co. v. Mun. of Metro. Seattle*,
   405 P.2d 581 (Wash. 1965) ................................................................................43

*Esca Corp. v. KPMG Peat Marwick*,
   959 P.2d 651 (Wash. 1998) ..........................................................................41, 47

# TABLE OF AUTHORITIES

## STATE CASES
### (continued)

Page

*Jones v. Strom Constr. Co.*,
　527 P.2d 1115 (Wash. 1974) ............................................................43

*Nunez v. Am. Bldg. Maint. Co. W.*,
　190 P.3d 56 (Wash. Ct. App. 2008)..................................................43

*Parkridge Assocs., Ltd. v. Ledcor Indus., Inc.*,
　54 P.3d 225 (Wash. Ct. App. 2002)..................................................28

## FEDERAL STATUTES

28 U.S.C. § 1291 ..............................................................................6

28 U.S.C. § 1332 ..............................................................................5

False Claims Act, 31 U.S.C. §§ 3729 *et seq* ......................................1, 22

31 U.S.C. § 3730(c)(2)......................................................................38

31 U.S.C. § 3730(h) ..........................................................................34

12 Stat. 696-699 ..............................................................................22, 23

Pub. L. No. 78-213, 57 Stat. 608-609 ...................................................23

False Claims Amendments Act of 1986,
　Pub. L. No. 99-562, 100 Stat. 3153-3169 ...........................................24

S. Rep. No. 99-345 (July 28, 1996) .......................................................25

Cong. Globe, 37th Cong. 3d Sess. (1863) ..............................................34

# TABLE OF AUTHORITIES

## FEDERAL RULES

**Page**

Fed. R. Civ. P 12(b)(6)...........................................................................7

Fed. R. Civ. P. 12(c).................................................................... *passim*

Fed. R. Civ. P. 15(a)(2)..........................................................................55

Fed. R. Civ. P. 26 ..................................................................................7

Fed. R. Civ. P. 54(c)..............................................................................56

Fed. R. Civ. P. 56 ..................................................................................8

## MISCELLANEOUS

Elletta S. Callahan & Terry M. Dworkin, *Do Good, Get Rich: Financial Incentives for Whistleblowing and the False Claims Act*, 37 Vill. L. Rev. 273 (1992)................................................................................23, 24

Paul D. Carrington, *Law and Transnational Corruption: The Need for Lincoln's Law Abroad*, 70 Law & Contemp. Probs. 109 (Vol. 4 2007) ...........23

Medicare Benefit Policy Manual Ch. 15 § 50.4.5 ...................................................11

## I. __INTRODUCTION__

Plaintiff-Appellant Cell Therapeutics, Inc. ("CTI") and Defendant-Appellee The Lash Group, Inc. ("Lash") are parties to a standard professional consulting services contract. As part of this contract, Lash agreed to indemnify CTI for all liabilities, losses, and damages resulting from Lash's negligent or wrongful acts and omissions. During the course of the parties' relationship, Lash acted negligently and in violation of law and breached its contractual duties to CTI. As a result of Lash's conduct, CTI suffered substantial damage. Pursuant to the parties' agreement, CTI demanded that Lash indemnify CTI for that damage. Lash refused. CTI filed this lawsuit to enforce its contractual right to indemnification, and for damages resulting from professional negligence. The District Court granted judgment on the pleadings dismissing CTI's claims, and CTI appeals.

Lash does not dispute at the pleadings stage whether the alleged contract for indemnification is valid, or whether the alleged negligent or wrongful conduct is covered by the contract's indemnification provision. Similarly, there is no dispute that CTI has stated a claim for actionable professional negligence. Nonetheless, the district court dismissed CTI's complaint, with prejudice and without leave to amend, for the sole reason that CTI was named a defendant in a *qui tam* action that included claims under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"). The district court concluded that the FCA bars any person *alleged* to have violated

the FCA from pursuing such claims, regardless of the merits of the claims themselves, and notwithstanding that there has never been any finding or adjudication of a violation of the FCA.

This Court should reverse the erroneous judgment of dismissal. There is no statute, provision, or language in the FCA that supports a trial court's refusal to enforce valid contractual rights, or its dismissal of properly stated claims for negligence. In enacting and amending the FCA, Congress has never in any way barred, prohibited, restricted, or limited such third-party claims. Nor has any Court of Appeals, including this Court, held either (i) that the FCA bars claims for contractual indemnification against a third party who is not a *qui tam* relator, or (ii) that a person who settles FCA claims with no admission or adjudication of liability may not pursue its otherwise valid claims against third parties solely because they relate to or touch upon alleged FCA liability.

Although the district court found no statutory basis requiring dismissal, the court believed that it was faithfully applying Ninth Circuit precedent. The district court read this Court's decision in *Mortgages, Inc. v. United States District Court*, 934 F.2d 209 (9th Cir. 1991), to require dismissal, at the pleading stage, of all claims for third-party indemnification brought by any person who has been *merely named* as a defendant in a *qui tam* action. As have some other district courts, the district court in this action misread and misapplied this Court's limited holding. In

*Mortgages,* this Court held only that Congress did not *create* a right of indemnification when it passed the FCA and that courts should not *imply* a right to indemnification against a *qui tam* relator by application of federal common law. The Court in *Mortgages* did not hold that a third-party claim, arising from the settlement of an FCA claim with no admission or adjudication of liability, brought in a separate action against a person other than a *qui tam* relator, and based on a pre-existing contract for indemnification, was barred by federal law. No other federal Court of Appeals has either. Thus, there exists neither statutory nor appellate authority for the district court's ruling. This appeal presents an opportunity to clarify the limited scope of the decision in *Mortgages* and to correct a line of cases in several trial courts that have expanded its holding beyond any foundation in the statutory language of the FCA or congressional intent.

Here, CTI simply asserts ordinary contractual indemnification and negligence claims against a professional consulting firm. CTI is entitled to have those claims decided on the facts and merits, according to rules that determine the enforceability of contractual obligations and professional duties generally. Whether or not CTI should recover on its claims should be adjudged according to the principles and doctrines developed to limit unjust enforcement of those rights over many decades—*in pari delicto*, unclean hands, allocation of fault, public policies prohibiting enforcement of illegal contracts, etc. There is neither

-3-

justification nor need for the federal courts, operating completely without congressional mandate, to fabricate a new, blunt, and indiscriminate federal common law limitation on such claims, as the district court essentially did below.

Indeed, a federal common law prohibition would impede the well-established policy of fostering the government's ability to litigate *qui tam* actions expeditiously to procure settlements and frustrate government efforts at recovery of false claims. In its order, the district court ignored these policies and instead emphasized a policy of "punishing" "wrongdoers," a policy that pervaded virtually all of its legal reasoning. The district court *presumed* that CTI must have been a wrongdoer because (i) the government *alleged* it was, and (ii) CTI paid to *settle* an FCA claim. The court's reasoning was not only logically flawed but contradicted by the settlement agreement executed by the government, which acknowledged that there had been no admission or finding of wrongdoing. The district court's conclusion that Congress intended to punish those merely accused of an FCA violation was without a legal or factual foundation, ignored the allegations of the complaint to the contrary, and denied CTI its due process of law.

Even if this Court were to decide that Congress intended to bar claims for indemnification of FCA-related liabilities, the district court also erred by dismissing CTI's claims for other non-legal business losses that were wholly independent of and unrelated to any alleged FCA settlement or liability. Here

again, the district court presumed that CTI's claims for business losses were inextricably linked to potential FCA liabilities even after CTI alleged and explained that they were not. Although damages are not required to be pled with particularity, and CTI requested leave to amend to clarify the independent nature of its damages if needed, the district court dismissed CTI's claims and denied leave to amend. Similarly, although only one of the government's several theories of liability arose from the FCA, the district court effectively assumed that CTI's entire $10.6 million settlement was paid as a consequence of the FCA allegations, effectively ignoring the substantial liability risk created by non-FCA claims such as negligent misrepresentation and "payment by mistake." The issues whether CTI's business losses are independent, and whether its settlement with the government should be allocated to FCA claims or other non-FCA claims, raise factual questions that cannot be resolved on a motion on the pleadings.

For these reasons, and as discussed below, CTI respectfully requests that this Court reverse the judgment of the district court and remand for trial so that CTI may pursue its claims according to the applicable principles of tort and contract.

## II.   **STATEMENT OF JURISDICTION**

The district court properly exercised diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. On July 18, 2008, CTI timely filed its notice of

appeal from a final judgment of the district court. This Court obtained its

jurisdiction pursuant to 28 U.S.C. § 1291.

## III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1)      Whether the FCA abrogated all third-party claims an FCA defendant

would otherwise possess under state law that arise from an express contractual

right of indemnification or from a professional duty of care.

2)      If the FCA does bar some third-party claims, whether the district court

erred in granting judgment on the pleadings dismissing otherwise well-pled claims

for indemnification and damages (i) against a third-party who is not a *qui tam*

relator, (ii) in an action separate from the *qui tam* action, (iii) where the indemnitor

is alleged to bear responsibility for any alleged FCA violations, (iv) where the

plaintiff settled but has never been adjudicated to have violated the FCA, and

(v) where plaintiff alleges independent damages independent of any alleged FCA

violations.

3)      Whether the district court erred in dismissing the plaintiff's claims for

separate business losses caused by professional negligence that are not dependent

on FCA liability.

4)      Whether the district court denied due process of law and applied

erroneous standards for adjudging factual allegations and inferences on a motion

for judgment on the pleadings.

## IV.   STATEMENT OF THE CASE

CTI filed this action for damages caused by Lash's breach of contract and breach of professional duties on January 22, 2007.  ER 44.  Lash did not file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), but answered on March 7, 2007.  ER 98 (Dkt. No. 7).  After the parties made initial disclosures and exchanged initial discovery requests, discovery was stayed by stipulation of the parties so that the parties could attempt to mediate their dispute. The February 28, 2008 mediation was not successful, and the stay was lifted automatically.

Prior to the expiration of the discovery stay, the parties agreed that their initial exchange of documents in response to requests for production of documents would occur on or about April 15, 2008.  Approximately one week after documents were produced, on April 21, 2008, CTI supplemented its initial disclosures with regard to damages to specify the independent business losses suffered due to Lash's conduct.  ER 20-22.  The parties concluded all fact discovery, including depositions of percipient witnesses, by May 22, 2008.  Pursuant to Federal Rule of Civil Procedure 26, CTI filed its expert disclosures on May 19, 2008.  *See* ER 100 (Dkt. No. 31).

On March 6, 2008, more than a year after the action was commenced, Lash moved for judgment on the pleadings.  ER 99 (Dkt. No. 26).  The parties

concluded briefing on April 14, 2008, and the district court heard oral argument in the case on May 23, 2008.  ER 104 (Dkt. No. 79).  Each party subsequently filed motions under Federal Rule of Civil Procedure 56 on June 18, 2008.  ER 104-05 (Dkt. Nos. 82, 89).  CTI moved for a summary judgment declaring Lash liable for breach of contract, and Lash moved for partial summary judgment.

On June 19, 2008, the district court issued its order granting Lash's pending Rule 12(c) motion for judgment on the pleadings without leave to amend, and entered final judgment in favor of Lash that same day.  ER 1-16; ER 17.  The court did not reach either party's motion for summary judgment.  CTI timely filed its notice of appeal on July 18, 2008.  ER 18-19.

## V.    <u>STATEMENT OF FACTS</u>

### A.    <u>Overview of the Facts and Procedural Background.</u>

Plaintiff/Appellant CTI is a biotechnology company that develops cancer therapies.  It was sued in a *qui tam* lawsuit under the FCA.  The government alleged that CTI caused Medicare to pay false claims submitted by cancer doctors who administered its drug, Trisenox, "off label."  The government alleged, in large part, that CTI misled treating physicians and Medicare administrators into believing that such off-label usage was "medically approved" and legally reimbursable.  The government alleged several theories of relief, including negligent misrepresentation, unjust enrichment, and violation of the FCA.  CTI

settled all claims with the government in April 2007 by agreeing to pay $10.6 million. The settlement did not allocate the funds among any of the government's claims, and stated that the settlement was not an admission of liability or acknowledgement of wrongdoing. CTI never made a profit from sales of Trisenox, and divested Trisenox by selling the drug to a larger drug company in 2006, well before the government filed its complaint and CTI settled these claims. *See infra.* § IV.D.

In January 2007, CTI filed the civil action that gives rise to this appeal. CTI sued Documedics, Inc., a medical reimbursement consulting firm, and its successor-in-interest, The Lash Group (both referred to herein as "Lash"). CTI's Complaint, the dismissal of which is the subject of this appeal, alleges that Lash was hired to provide its expertise and knowledge in consulting with CTI about reimbursement for Trisenox. Lash signed and delivered letters directly to Medicare carriers on its own letterhead advising carriers that off-label uses of Trisenox were medically approved because they were listed in a recognized compendium. This was not true. Lash also engaged in direct communications with physicians, providing the same erroneous advice. Lash's representations were false and misleading and allegedly caused doctors to file and Medicare to reimburse false or mistaken claims. Lash also provided the same misleading

advice to CTI, on which CTI relied in making critical business decisions about Trisenox, leading to substantial operating losses. *See infra.* § IV.C.

CTI seeks to recover on Lash's valid and binding contractual promise to indemnify CTI for all liabilities, losses, and damages caused (i) by Lash's negligence, (ii) intentional misconduct, and (iii) violations of laws. CTI also alleges professional negligence. The district court granted Lash's motion for judgment on the pleadings, holding that any claims for indemnification or recovery brought by an FCA defendant are barred. At the time of dismissal, there had never been a finding or adjudication that CTI had ever violated the FCA. Nor was there any finding or adjudication that the settlement was based solely on FCA violations, as opposed to other claims alleged such as negligent misrepresentation, unjust enrichment, or payment by mistake. *See infra.* § IV.E.

## B.     CTI and Its Contract with Lash.

CTI is a small biotechnology company located in Seattle, Washington. ER 45 ¶ 1; ER 47 ¶ 5. Its primary business is the development of drugs for the treatment of various forms of cancer, particularly rare strains that otherwise get little attention. CTI's first drug approved for sale in the United States was Trisenox. In 2000, the FDA approved Trisenox for the treatment of a rare and virulent form of leukemia known as acute promyelocytic leukemia ("APL"). ER 48 ¶ 13. In addition to this FDA-approved use, oncologists also prescribed

Trisenox "off-label" for the treatment of other cancers. ER 50 ¶ 21. Federal drug laws permit and recognize off-label prescriptions, and off-label use of cancer drugs is both common and lawful. *Id*.

Medicare reimburses for off-label uses of oncology drugs if certain circumstances are present: (1) the particular off-label use is supported by a listing in a recognized "compendium," (2) the off-label use is supported by peer-reviewed articles in recognized medical journals, or (3) a Medicare carrier determines the drug is medically accepted generally as safe and effective for the particular use.[1]

When the FDA approved Trisenox for the treatment of APL, it was the first drug CTI had successfully placed on the market. ER 48 ¶ 13. CTI was a young and small company, and lacked a reimbursement department with expertise in Medicare reimbursement and other private and government drug-payment systems. *Id*. Accordingly, CTI hired Documedics, a national reimbursement expert specializing in oncology drugs, later acquired by and merged with The Lash Group, Inc. ER 45 Preamble & ¶ 1; ER 48 ¶ 13. Lash was also retained to operate a hotline to field questions from doctors and patients about the reimbursement status of Trisenox. ER 76. In this role, Lash engaged in direct communications with physicians and patients, as well as with the private insurers and Medicare

_____

[1] Medicare Benefit Policy Manual Ch. 15 § 50.4.5, http://www.cms.hhs.gov/ manuals/Downloads/bp102c15.pdf, at 61-65.

carriers who were ultimately responsible for deciding whether particular uses of Trisenox would receive reimbursement. ER 51-52 ¶ 25. CTI transferred its reimbursement consulting to Lash in large part to take advantage of Lash's specialized reimbursement consulting expertise in oncology drugs. ER 48 ¶ 13.

CTI and Lash entered into a Service Agreement on January 2, 2001. ER 72. That agreement makes a number of representations about Lash's qualifications and expertise:

- "Documedics covenants and agrees that the methods it uses in performing the Services shall meet the generally acceptable performance standards of similarly situated top-tier agent reimbursement companies or organizations, and it will provide sufficient numbers of individuals reasonably acceptable to CTI possessing the requisite skills, expertise and relevant experience ("the Documedics Specialists"), in order to fully, properly and adequately perform such services." ER 68 § 10.2.

- Documedics' staff would "receive all necessary training, and Documedics, its affiliates and the Documedics Specialists will possess all requisite licenses and permits, to fully, properly and adequately perform such services." *Id*.

- Documedics stated: "Our job, as reimbursement experts, is to ensure that providers are as well informed as possible as to all patient choices for reimbursement and that reimbursement will not be an issue in terms of therapy." ER 76.

- Documedics covenanted to "use its best efforts in performing the Services and . . . comply with all applicable business conduct, regulatory, and health and safety guidelines . . . ." ER 68 § 10.4.

Based on these and other representations made by Lash, CTI reasonably believed that Lash would provide expert technical consulting services to answer CTI's

health care reimbursement questions, refrain from violating any laws, and assist CTI in complying with laws on Medicare reimbursement, all as required by the Service Agreement. ER 50 ¶ 18.

The Service Agreement also contains an unambiguous and broad indemnification provision by which Lash expressly agreed to indemnify CTI for the losses caused by Lash's negligence and breach of its contractual duties:

> Documedics shall indemnify and hold harmless CTI . . . against all liabilities, losses, costs, expenses (including reasonable attorney's fees) and damages *arising out of or resulting from willful misconduct or negligent act or omissions of Documedics* . . . relating to responsibilities under this Agreement; *from Documedics's breach of any covenant or agreement contained herein;* . . . *or from any violation by Documedics* . . . *of any municipal, state, federal laws, rules, or regulations applicable to the performance of Documedics['] obligations under this Agreement*.

ER 67 § 8.1 (emphasis added). This provision assured CTI that Lash would provide financial indemnity if Lash performed its consulting services negligently or in violation of federal laws, and by its own actions exposed CTI to liability.

## C.    Lash Breaches Its Duties to CTI and Exposed CTI to Liability.

CTI's Complaint alleges that Lash violated its contractual and professional duties to CTI in several ways. *First*, the Complaint alleges that Lash committed professional negligence when it erroneously advised CTI that "Medicare carriers should reimburse for Trisenox" for off-label uses because Trisenox was listed in certain compendia. ER 50-52 ¶¶ 21-25.

*Second*, Lash executed and delivered letters under its own letterhead to every Medicare carrier in the country in November 2001, and again in February 2002. ER 51-52 ¶ 25. In these letters, Lash directly advised the Medicare carriers that Trisenox should be reimbursed for off-label uses, but falsely misrepresented the basis for its advice that such uses were medically approved. *Id*. Thus, the Complaint alleges that Lash itself misled Medicare into paying erroneous claims by making its own false and misleading statements about the off-label approval status of Trisenox, on Documedics letterhead, directly to Medicare payors. *Id.*; ER 53-54 ¶¶ 32-34.

*Third*, the Complaint alleges that Lash neglected its promise to properly train and advise CTI's sales force about eligibility for Medicare reimbursement. ER 77. CTI reasonably relied on Lash's advice in organizing its reimbursement and sales and marketing activities and making critical business decisions. ER 50 ¶ 19. Had Lash provided competent, non-negligent professional advice, CTI could have taken appropriate steps to assure compliance with the Medicare rules. ER 53 ¶ 29. CTI would also have divested itself of Trisenox sooner than it did, avoiding millions in losses. ER 20-22.

In summary, CTI alleges that the representations made to physicians and Medicare carriers that exposed CTI to potential liability were made either by Lash directly or as a result of Lash's negligent and erroneous advice. ER 50-51. Lash's

-14-

negligent conduct on Medicare reimbursement issues created potential liability for CTI for the unlawful or mistaken payments made by Medicare. *Id*. Additionally, and separate from potential liability to the United States under various theories, Lash's negligent advice caused CTI to make critical business decisions based on mistaken assumptions about its market opportunities for Trisenox, and that advice ultimately caused significant business losses. ER 46 ¶ 4; ER 58 ¶ 59.

### D. The Government Investigation and the Qui Tam Action.

In the fall of 2004, the United States Attorney's Office in the Western District of Washington began investigating statements made by Lash and CTI about the eligibility of Trisenox for Medicare reimbursement. ER 53 ¶ 30. CTI cooperated fully and voluntarily with the government. *Id*. The government's investigation included allegations that certain claims made by physicians and patients for reimbursement of Trisenox were improper and/or that Medicare paid those claims by mistake. ER 53 ¶ 32. For example, the government claimed that Medicare carriers approved off-label reimbursement of Trisenox in reliance on the erroneous statements made in the letter to Medicare carriers sent by Lash, acting as CTI's agent. *Id*.

While CTI was cooperating with the government's investigation, a relator named James Marchese filed a *qui tam* complaint against CTI alleging violations of the FCA as well as other statutory and common law claims. ER 53 ¶ 31; ER 24.

After the complaint was filed, the government continued its investigation of and negotiations with CTI. These negotiations culminated in a settlement agreement under which CTI agreed to pay the government $10.5 million. ER 54 ¶ 35; *see also* ER 24-43. The agreement was not an admission or evidence of liability. *See* ER 27 ¶¶ H-I; ER 34 ¶ 11. On April 16, 2007 the government simultaneously filed its complaint in intervention against CTI and a stipulated dismissal of the same claims.

The settlement agreement applies to specific "Covered Conduct" that, according to the government's allegations, created potential liability for CTI under both FCA and non-FCA claims. ER 25-26 ¶ E. The agreement refers to a series of allegedly false or misleading statements made to doctors and government medical payors allegedly caused by CTI. *Id*. As alleged in the Complaint, some of these statements were made directly by Lash, acting as CTI's agent. ER 51-52 ¶ 25; ER 53-54 ¶¶ 32-34. In some circumstances, the government alleges that these statements resulted in the submission of false or fraudulent claims to Medicare. ER 25-26 ¶ E. Additionally, the government alleges that certain of these statements resulted in Medicare directors "mistakenly" approving reimbursement for off-label indications of Trisenox. *Id*. The Covered Conduct gave rise to potential liability under "common law theories of payment by mistake, unjust

enrichment, negligent misrepresentation and fraud." ER 28 ¶ 2. These theories of recovery were distinct from CTI's potential liability under the FCA. *See id.*

Not surprisingly, the agreement provides that CTI admitted no wrongdoing, denied any and all liability, and that the agreement could not be used in any other proceeding as an admission or acknowledgement of liability. The initial recitals make clear that CTI denied "each and every one of [the government's] allegations and all allegations described in any pleading filed in the [*qui tam* action]." ER 27 ¶ H. The recitals also include CTI's contention that Lash bore primary responsibility for any alleged violations, and that the statements at issue in the case "were a consequence of negligent advice provided to CTI by a third party." ER 27 ¶ I. In addition, the terms of the agreement expressly state that it "is neither intended by the parties to be, nor should be, interpreted as an admission of liability by CTI." ER 34 ¶ 11. It further provides that no representation made in the agreement could be admissible as evidence of any fault or omission by CTI. *Id.*

On June 27, 2005, CTI presented formal written notice to Lash that a claim had been or could be made against CTI for which Lash was responsible for providing indemnification. ER 55 ¶ 38. Lash replied that it would not agree to indemnify or defend CTI. ER 56 ¶ 42.

### E. The Proceedings Below and the District Court's Order of Dismissal.

CTI filed this suit against Lash in January 2007. ER 44. In its Complaint, CTI alleges claims for breach of contract, breach of contractual indemnification, breach of implied contractual warranties of good faith and fair dealing, and professional negligence. ER 57-61 ¶¶ 55-73. CTI seeks damages under two distinct theories of recovery. *First*, CTI seeks recovery of its $10.6 million settlement payment, plus related *qui tam* legal expenses, pursuant to the indemnification provision of the parties' agreement. ER 20-22. *Second*, CTI seeks to recover business losses it suffered that were caused by Lash's breaches of contract and negligence but that were unrelated to the *qui tam* liabilities. *Id*. In its prayer for relief, CTI sought all such damages in the amounts proven at trial, as well as any such other and further relief as the court deemed just and proper. ER 61.

In granting Lash's motion for judgment on the pleadings, the district court framed the "determinative inquiry" as "whether *Mortgages* and its progeny bar this indemnification action." ER 5. The district court understood that the Ninth Circuit's decisions in *Mortgages* and *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827 (9th Cir. 1993) collectively operated to bar all counterclaims in FCA actions except for those that seek recovery of independent damages. ER 6-8.

CTI argued below that its contractual indemnification claim was distinguishable from *Mortgages* and its progeny on multiple grounds. The court rejected each argument. ER 9-13. The district court concluded that *Mortgages* prohibited *all* forms of indemnification, including contractual indemnification for another party's own negligent acts. *See* ER 9-10 (declining to "carve out an exception to *Mortgages* for express contractual indemnification"). The district court also dismissed CTI's claims for independent business losses. In so doing, the district court found that "the $12.3 million in supplemental business damages did not walk into this suit on its own power; the damages rode on the back of the claims for FCA indemnification barred by *Mortgages*." ER 15. The district court further found that "[w]ithout the government's investigation, there would have been no consequent business losses." *Id.*

CTI had argued that any deficiencies in its claim for business losses could be corrected, and requested leave to amend its complaint. The district court denied CTI the opportunity to amend its pleadings to state its business damages in more detail and granted dismissal of CTI's original complaint with prejudice.

The court entered final judgment in favor of Lash on June 19, 2008. ER 17; ER 105 (Dkt. No. 95). CTI timely filed its notice of appeal on July 18, 2008. ER 18-19; ER 106 (Dkt. No. 97).

## VI.   **SUMMARY OF THE ARGUMENT**

The district court erred when it dismissed with prejudice CTI's well-pled claims for contractual indemnification and professional negligence on the grounds that such claims are barred by the FCA. *First*, there is no provision or language in the FCA that supports a refusal to enforce valid contractual rights or dismissal of well-pled claims for professional negligence. In enacting and amending the FCA, Congress has never prohibited third-party claims such as CTI's. *Second*, no Court of Appeals, including this Court, has held that claims for contractual indemnification against a third party who is not a *qui tam* relator, such as CTI's, are prohibited under the FCA. *Third*, contrary to established Ninth Circuit case law, the district court also improperly dismissed CTI's claims for damages that are wholly independent from any potential FCA liability incurred by CTI. *Fourth*, in violation of Rule 12 and due process, the district court made improper presumptions of fact that contradicted allegations of CTI's complaint and failed to accept the truth of CTI's allegations. The district court presumed that CTI had violated the FCA, presumed that its business losses were directly related to FCA violations, and presumed that its settlement was motivated entirely to avoid potential FCA liability, notwithstanding the government's pursuit of other non-FCA claims.

CTI has alleged valid claims for contractual indemnification and professional negligence. Whether or not CTI should recover on its claims should be adjudged according to the principles and doctrines developed to limit unjust enforcement of those rights over many decades. The district court effectively created a new federal common law limitation on such claims. There is no support for such a limitation in the FCA, congressional intent, judicial decisions interpreting that statute, or the public policies animating that statute. As such, the district court's order should be reversed and CTI's claims should be permitted to proceed to trial.

## VII. <u>ARGUMENT</u>

### A. <u>Standard of Review.</u>

This Court reviews *de novo* a grant of judgment on the pleadings, taking all material allegations of the non-moving party in its pleadings as true and construing the pleadings in the light most favorable to that party. *Doyle v. Raley's Inc.*, 158 F.3d 1012, 1014 (9th Cir. 1998) (reversing grant of judgment on the pleadings). A judgment on the pleadings may only be upheld when the defendant clearly establishes that, on the facts alleged in the pleadings, the plaintiff can prove no plausible set of facts that would entitle him to relief and the defendant is entitled to judgment as a matter of law. *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 529 (9th Cir. 1997) (reversing judgment on the pleadings that

defendant owed no duty to indemnify plaintiff); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, __, 127 S. Ct. 1955, 1965 (2007) (factual allegations must raise right to relief beyond the merely speculative and into the realm of plausibility). Judgment on the pleadings is improper if there are any allegations in the complaint that, if proved, would permit the plaintiff to recover. *See Deveraturda v. Globe Aviation Sec. Servs.*, 454 F.3d 1043, 1046 (9th Cir. 2006).

**B.    The District Court Erred in Entering Judgment of Dismissal on CTI's Claims for Contractual Indemnification and Negligence.**

**1.    The FCA Does Not Bar Contractual Indemnification Claims.**

There is not now, nor has there ever been, any statute, provision or language in the FCA that bars, prohibits, limits, or otherwise restricts a *qui tam* defendant's right to pursue claims for indemnification or damages against third-parties, with the arguable exception of retaliatory counterclaims against a *qui tam* relator.

The text of the originally enacted FCA made no reference to indemnification, and did not in any way prohibit indemnification. *See generally* Act of March 2, 1863, 12 Stat. 696-699 (codified as amended at 31 U.S.C. §§ 3729-33 (2000)). The statute's legislative history was similarly silent on the question of indemnification. *See Mortgages*, 934 F.2d at 213 ("We cannot find anything in the legislative history of the FCA that mentions contribution or indemnification."). Thus, neither the original text nor the history of the FCA

suggests any intention by Congress to prevent FCA defendants from exercising

their contractual rights to indemnification, or pursuing other claims against third

parties.

The FCA was first enacted during the height of the Civil War to provide a

mechanism for the government and its citizens to fight war profiteers. 12 Stat.

696-699; *see* Paul D. Carrington, *Law and Transnational Corruption: The Need*

*for Lincoln's Law Abroad*, 70 Law & Contemp. Probs. 109, 123 (Vol. 4 2007).

Known as "Lincoln's Law," the FCA enabled private citizens to bring *qui tam*

actions on behalf of the government against individuals who obtained money from

the federal government through false pretenses.[2]  In its initial incarnation, the FCA

provided that relators and the government would share equally in the proceeds of

any *qui tam* suit.[3]

After an initial wave of successful suits during the Civil War, the FCA

largely fell into disuse.  By the mid-1980s, fewer than six FCA actions per year

were being filed nationwide.  Elletta S. Callahan & Terry M. Dworkin, *Do Good,*

*Get Rich:  Financial Incentives for Whistleblowing and the False Claims Act*, 37

---

[2] Among those sued in the immediate wake of the FCA's passage included
those accused of selling disease-ridden horses, rifles without triggers, diluted
gunpowder, and other defective military equipment.  Carrington at 123.

[3] This "relator's share" was later capped at ten percent in an amendment
passed in 1943 designed expressly to limit *qui tam* suits.  *See* Pub. L. No. 78-213,
57 Stat. 608-609.

Vill. L. Rev. 273, 303 (1992). Spurred again by concerns that the government was being defrauded in its military expenditures, Congress enacted the False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153-3169. Congress provided additional incentives for private citizens to file suits. *See id.*; *see also* Callahan & Dworkin at 303-04. Among the changes made were an increase in the relator's share (with a corresponding guarantee of minimum recovery to a successful relator), a relaxation of the requisite mental state for proving liability, and an imposition of treble damages against violators. *See generally* Pub. L. No. 99-562, 100 Stat. 3153-3169; *see also* Callahan & Dworkin at 305-17 (discussing revisions).

Like the original text of the FCA, the False Claims Amendments Act included no prohibitions or restrictions on rights of contribution and indemnification. *See generally* Pub. L. No. 99-562, 100 Stat. 3153-3169. The legislative history remained silent on these claims. *Cf. Burch ex rel. United States v. Piqua Eng'g, Inc.*, 145 F.R.D. 452, 457 (S.D. Ohio 1992) ("No provision of the FCA, or its legislative history, supports the proposition that a defendant may not raise a counterclaim."). Thus, even when Congress amended the FCA specifically to revitalize private enforcement against government fraud and enhance the

government's ability to recover its losses,[4] it included no provision and expressed no intention to bar FCA defendants from receiving indemnification for their losses pursuant to valid contracts. Nor has it done so since 1986.

The lack of any language in the statute disturbing a private party's contractual right to indemnification should be the end of the inquiry. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (noting that when a statute does not reach particular conduct "we think that conclusion resolves the case"). As in *Central Bank*, because this case concerns whether certain claims are prohibited by the FCA, "the statute itself resolves the case." *Id*. at 178. Moreover, the Supreme Court has repeatedly held that courts cannot infer from congressional silence an intent on the part of the legislature to interfere with existing legal rights. *See Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); *Employees of Dep't of Pub. Health & Welfare, Mo. v. Dep't of Pub. Health & Welfare, Mo.*, 411 U.S. 279, 284-85 (1973) (Congress cannot be presumed to have altered financial burdens silently); *cf. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987) (noting that "Congress' silence is just that—silence"). To the contrary, congressional silence is an indication of congressional intention not to

---

[4] *See, e.g.*, S. Rep. No. 99-345, at 4 (July 28, 1996) (noting that the amendments to the FCA "are aimed at correcting restrictive interpretations of the act's liability standard, burden of proof, *qui tam* jurisdiction and other provisions in order to make the False Claims Act a more effective weapon against government fraud").

interfere with existing rights. *See, e.g.*, *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 35 (1995) (inferring from congressional silence an intent not to disturb existing legal rights).

In its 150-year existence, the FCA has never contained any prohibition against or restriction on the rights of FCA defendants to assert their pre-existing legal rights for contractual indemnification, or other valid claims such as professional negligence. Nor does the legislative history of the original Act or its subsequent amendments reveal any congressional intention to deprive parties of valid agreements and independent rights. Accordingly, the FCA contains no statutory bar to contractual indemnification claims or other valid claims in tort. The district court's creation of a federal common law to that effect finds no support in the statute, and contradicts established principles requiring judicial restraint in the creation or invalidation of independent rights in the face of congressional silence.

### 2. This Court's Decision in *Mortgages* Does Not Require Dismissal of Contractual Indemnification Claims.

The district court seemingly recognized that the FCA itself does not bar contractual indemnification, as it engaged in no statutory analysis whatsoever in the Order dismissing CTI's claims. Instead, the district court turned to this Court's decision in *Mortgages* and found that *Mortgages* barred CTI's contractual indemnification claims. ER 5 (finding that "the determinative inquiry is whether

*Mortgages* and its progeny bar this indemnification action"). In so doing, the district court extended *Mortgages* far beyond its limited holding and ignored several significant, dispositive distinctions between the facts in *Mortgages* and the facts here.

**a)** *Mortgages* **Is Silent As to the Viability of Contractual Indemnification Claims.**

In *Mortgages*, two relators brought a *qui tam* action under the FCA alleging that the defendants were involved in a scheme to defraud HUD. 934 F.2d at 210. The defendants asserted counterclaims back against the relators seeking indemnification and/or contribution from them based on their part in the scheme. *Id*. at 211 & n.1. Notably, none of the defendants asserted that their right to indemnification or contribution was created by an express contract of indemnification with the relators. Thus, the *Mortgages* court was left to determine whether such a right was implicitly created in the FCA itself or under federal common law. *Id*. at 212-13. The court initially found that no such right could be implied. *Id.* It noted the absence of any legislative history suggesting that the FCA was intended to provide defendants with a remedy against a *qui tam* plaintiff with "unclean hands." *Id*. at 213. Similarly, the court concluded that the FCA's enforcement mechanisms were sufficiently comprehensive that the federal courts were afforded "no room for the creation of additional federal common law." *Id*. Fairly read, *Mortgages* is just a straightforward application of orthodox principles

of statutory construction and federalism. *Mortgages* simply rejected arguments for

implied claims of contribution and indemnification where Congress has created

none. *Id*.; *see also McSherry v. Capital One FSB*, 236 F.R.D. 516, 520 (W.D.

Wash. 2006) (summarizing *Mortgages* as "applying *Cort* [*v. Ash*, 422 U.S. 66

(1975)] factors to find that the False Claims Act provides no right to contribution

or indemnity for defendants against *qui tam* plaintiffs with 'unclean hands'");

*United States v. Northrop Corp.*, 59 F.3d 953, 961 n.4 (9th Cir. 1995) (noting that

the *Mortgages* analysis of federal common law was "limited to situations involving

the canon applicable to *implied rights of action*" (emphasis added)).

In this case, by contrast, CTI does not rely on the FCA or federal common

law as the *source* of its legal rights. Contrary to the situation in *Mortgages* and

district court cases that have followed it, CTI's claim is not for common law

*equitable* indemnification. This distinction is critical because a claim for equitable

indemnification arises from a finding of liability.[5] Not so, CTI's claim for

indemnification, whose legal source is a contractual promise, and which arises

from the losses caused by Lash's negligent acts or conduct in violation of law, not

CTI's own acts. ER 67 § 8.1 CTI alleges standard state-law claims arising from

---

[5] *Parkridge Assocs., Ltd. v. Ledcor Indus., Inc.*, 54 P.3d 225, 230-31 & n.32
(Wash. Ct. App. 2002) ("It states '[i]t is settled law that [equitable] indemnity
actions accrue when the party seeking indemnity pays or is legally adjudged
obligated to pay damages to a third party.'" (quoting *Central Wash. Refrigeration,
Inc. v. Barbee*, 946 P.2d 760, 764-65 (Wash. 1997))).

valid contractual rights and well-established professional duties. This distinction is critical to understanding why CTI's contractual rights state a valid claim even though claims for equitable indemnification—arising from FCA liability—might not.[6]

The district court relied on the following dictum at the end of the *Mortgages* opinion as controlling authority: "Because there is no basis in the FCA or federal common law to provide a right to contribution or indemnity in a FCA action, we conclude that there can be no right to assert state law counterclaims that, if prevailed on, would end in the same result." 934 F.2d at 214; *see also* ER 6. This single sentence, offered without analysis or explanation, does not follow from the main holding of the opinion, which focused only on whether a right of action for indemnification was created by the FCA or could be found in federal common law. Notably, neither this Court nor any other Court of Appeals has applied this language to bar a contractual right to indemnification similar to the one asserted by CTI here. Nor should it.

> **b)** **There Are No Grounds for Applying a Federal Common Law Rule Barring Contractual Indemnification Claims.**

By categorically barring CTI's claims, the district court essentially did what the *Mortgages* court declined to do—create a rule of federal common law

---

[6] Perhaps because the district court inferred that CTI violated the FCA and

governing FCA-related claims for indemnification. However, neither of the two narrow categories in which the formulation of federal common law is appropriate—where a federal rule is necessary to protect uniquely federal interests, or where Congress has given express power to the courts to develop substantive law—apply here. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981); *Wheeldin v. Wheeler*, 373 U.S. 647, 651-52 (1963).

With regard to the first category, the authority to create federal common law exists "only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Indus.*, 451 U.S. at 641 (footnotes omitted). Clearly the latter two situations are inapplicable. Moreover, as *Mortgages* itself recognizes, questions of when an FCA defendant may recover damages from a third party pursuant to state laws governing contract and tort does not implicate any unique federal interests. 934 F.2d at 213; *see also Texas Indus.*, 451 U.S. at 642 (noting that contribution claims among private parties do not "involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority").

---

misunderstood its claim to arise from those violations, this distinction eluded it.

Similarly, Congress did not vest jurisdiction in the courts to create governing rules of law concerning claims made by a party who happens to be a defendant in an FCA action. For example, in enacting the Labor Relations Management Act and the first two sections of the Sherman Act, Congress used expansive, sweeping language to give courts wide discretion to "give shape to the statute's broad mandate by drawing on common-law tradition." *Id.* at 642-43 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688 (1978)). The *Mortgages* court recognized that the FCA afforded courts no such sweeping authority. 934 F.2d at 213. Thus, the federal courts have not been granted authority under the FCA to craft rules of federal common law that abrogate rights granted pursuant to state law.

*Texas Industries* and *Mortgages* evaluated whether federal common law permitted the *creation* of certain rights of action in a statute that did not expressly provide for such rights. However, their analysis applies with equal force to the question of whether federal law permits the *preclusion* of existing rights when the relevant federal statute does not expressly preclude those rights. *Cf. Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (determining whether a civil action in tort against a government contractor is precluded by the operation of federal common law). As noted above, nothing in the FCA or its history suggests Congress intended to bar contractual indemnification rights where one party is a

defendant in an FCA action. In the absence of legislative action, the district court did not have authority to invalidate CTI's rights.

> **c)** **Significant Factual Differences Between CTI's Case and *Mortgages* and Its Progeny Compel a Different Result Here.**

In extending *Mortgages* beyond its reasoned holding, the district court disregarded fundamental differences between the facts in *Mortgages* and the facts here. Simply put, the limitation on claims against a *qui tam* relator in *Mortgages* was never intended to apply to a party like CTI who brings claims (i) pursuant to an express *contractual* right of indemnification, (ii) against a party who is not a *qui tam* relator, (iii) in an action other than the *qui tam* action, (iv) premised upon independent contractual and professional duties, (v) where the indemnitor is alleged to bear responsibility for the alleged FCA violations, (vi) where the plaintiff has settled and never been adjudicated to have violated the FCA, and (vii) where all or part of the plaintiff's damages were not based upon FCA violations. Neither *Mortgages* nor any previous district court applying *Mortgages* barred an indemnification claim in the above circumstances.[7] As shown below,

---

[7] The cases cited by Lash below, and relied upon by the district court, are all similarly distinguishable from the facts here. *See United States ex rel. Pub. Integrity v. Therapeutic Tech., Inc.*, 895 F. Supp. 294, 296-97 (S.D. Ala. 1995) (barring claim in FCA proceeding so as not to interfere with recoupment action by focusing on apportionment of fault, but permitting defendant to seek indemnification in another court); *United States v. Nardone*, 782 F. Supp. 996 (M.D. Pa. 1990) (barring counterclaims brought during an underlying FCA

these fundamental differences in CTI's case not only render *Mortgages* inapposite, they compel a contrary result.

The most significant, as noted above, is that the defendants in *Mortgages* were not asserting a contractual right of indemnification, but instead sought to create such a right under the FCA or federal common law. By contrast, CTI's contract with Lash, in which Lash expressly agreed to indemnify CTI for "*all* liabilities, losses, costs, expenses (including reasonable attorney's fees) and damages" arising out of or resulting from Lash's conduct, (ER 67 § 8.1), provides CTI with a clear and unambiguous right to seek indemnification from Lash for injuries and losses caused by Lash's own acts.

Another significant difference is that the defendants in *Mortgages* pled retaliatory counterclaims against the relators, whereas CTI seeks indemnification from a third party in a separate action. In *Mortgages*, this Court recognized that allowing counterclaims against relators would frustrate the FCA's goals of policing

---

proceeding where defendant had already been found guilty of criminal fraud); *United States v. Dynamics Research Corp.*, 441 F. Supp. 2d 259 (D. Mass. 2006) (barring counterclaims raised during underlying FCA action); *United States v. Hero*, No. 78 Civ. 4587, 1981 WL 1982 (S.D.N.Y. July 27, 1981) (unpublished) (rejecting implied right of contribution among co-defendants); *United States v. Warnings*, No. CIV. A. 93-4541, 1994 WL 396432 (E.D. Pa. July 26, 1994) (unpublished) (finding no implied right of contribution); *United States v. Kennedy*, 431 F. Supp. 877, 878 (C.D. Cal. 1977) (barring indemnification claim where defendant was already found liable for FCA violations); *Heart Doctors, P.S.C. v. Layne*, Civ. No. 6:05-636, 2006 WL 2692694 (E.D. Ky. Sept. 13, 2006) (unpublished) (defendant offered no reasons for distinguishing *Mortgages*).

fraud against the government through private citizens. The *Mortgages* court noted that "the qui tam provisions are based upon the idea of 'setting a rogue to catch a rogue.'" 934 F.2d at 213 (quoting Cong. Globe, 37th Cong. 3d Sess. 955-56 (1863) (remarks of Sen. Howard)). Similarly, when the FCA was amended in 1986, one of the key new provisions was protection for relators against retaliation for reporting allegations of fraud. *See* 31 U.S.C. § 3730(h).

Permitting counterclaims against relators, then, risks allowing the very retaliation Congress sought to prohibit, with the effect of dissuading "rogues" from reporting fraudulent activity. *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 505 F. Supp. 2d 20, 28 (D.D.C. 2007) (allowing counterclaims against relators "would deter relators, allow wrongdoers to shift their costs, and would disrupt the intended framework of incentives and punishments established by the FCA"); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 779 F. Supp. 1252, 1254 (N.D. Cal. 1991) (construing *Mortgages* to protect relators, citing concern for "allow[ing] wrongdoers to retaliate against whistleblowers"). Lash, by contrast, is not a relator and is not entitled to the protections Congress afforded to relators. Allowing claims to proceed against a third-party consultant who is not a *qui tam* relator would have no deterrent effect on *qui tam* filings nor undermine *qui tam* enforcement incentives.

The nature of the losses for which CTI seeks indemnity are also different than those at issue in *Mortgages*. There, the defendants sought indemnification or contribution only "against any recovery or judgment in favor of the United States in the FCA action." 934 F.2d at 211. Any right to recovery on the part of the *Mortgages* defendants *depended* on a finding of liability against them. Thus, without a finding a liability, those defendants would enjoy no right to indemnification.

CTI's claims in this case—and its contractual right to indemnification—are not so limited. Both the relator and the United States alleged non-FCA claims against CTI. CTI is entitled to prove at trial that its settlement with the United States was based, in whole or in part, on the non-FCA claims asserted against CTI. Thus, in contrast to the *Mortgages* defendants, whose alleged entitlement to recovery was dependent on FCA liability, CTI has a right to receive indemnification for non-FCA liabilities. To the extent CTI's losses are not connected to FCA liability, *Mortgages* imposes no bar to recovery. *See United States ex rel. Madden v. Gen. Dynamics Corp.*, 4 F.3d 827, 831 (9th Cir. 1993) ("Counterclaims for independent damages are distinguishable . . . *because they are not dependent on a qui tam defendant's liability*." (emphasis added)).

In the proceedings below, the district court relied on the allegations in the government's complaint and the fact of settlement to conclude that CTI's losses

were effectively FCA liabilities. *See* ER 13 (describing the "certainties" that "CTI paid $10.5 million to settle an FCA action in which the government never disavowed its contention that CTI committed fraud"). To the extent the district court inferred from the government's allegations that CTI was a wrongdoer under the FCA, the court disregarded its obligation under Rule 12(c) to accept the facts alleged in CTI's complaint as true. *See infra* § VII.C. In analogous circumstances, this Court has reversed a district court that relied on mere allegations in a separate action to dismiss valid claims for indemnification.

In *Enron Oil Trading & Transportation Co. v. Walbrook Insurance Co.*, 132 F.3d 526 (9th Cir. 1997), the Ninth Circuit reversed a judgment on the pleadings barring the plaintiff's contractual indemnification claims. Enron sought indemnification for losses incurred defending against an action for negligence, strict liability, breach of contract and warranty, fraud, and tariff violations arising out of the alleged injection of certain chemicals into an oil pipeline. *Id*. at 528. The district court found that the complaint alleged "a series of knowing and intentional acts" which were excluded from the indemnification agreement and for which indemnification was barred by Montana public policy. *Id*. at 528-29. In reversing the judgment, the Ninth Circuit noted that the complaint in the underlying action was "not limited to the intentional wrongful acts to which the district court adverted, but also included claims for negligence and strict liability

not barred by Montana's public policy." *Id.* at 529. The court recognized that "Enron would be entitled to prove in this action that the settlement payment was, in whole or in part, attributable to the negligence and strict liability claims; it would be entitled to prove that the claims based on intentional acts were not factors—or were minor factors—in the settlement because they lacked merit." *Id.*

The *Enron* analysis applies with full force in this case. Just as Enron was permitted to prove that its settlement was not based on alleged intentional misconduct, so too should CTI be entitled to prove that its settlement was attributable—in whole or in part—to non-FCA claims. Similarly, just as the district court in *Enron* erred by presuming that Enron's losses were attributable to knowing and intentional acts, the district court here erred by inferring that CTI's settlement was the equivalent of FCA liability.

### 3. Permitting CTI to Proceed with Its Claims Furthers the Policy Goals of the FCA.

Policy considerations cannot override the plain language (or silence) of a federal statute, except to the extent that they show adherence to the text would result in an outcome "so bizarre" that Congress could not have intended it. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994) (internal quotation marks omitted). As the text of the FCA clearly does not forbid the claims brought by CTI here, policy considerations have little relevance. *See id.*; *Pinter v. Dahl*, 486 U.S. 622, 652-54 (1988). If policy

considerations are relevant, however, CTI's claims promote rather than interfere with the policies underlying the FCA.

As explained in the three sections below, courts evaluating potential indemnification claims in connection with FCA actions have identified three policy concerns to justify disallowing those claims. First, courts protect relators from counterclaims that would chill whistleblowing activity. *See, e.g.*, *Newsham*, 779 F. Supp. at 1254. Second, courts facilitate the government's ability to obtain rapid recovery when it has been defrauded. *See, e.g.*, *Public Integrity*, 895 F. Supp. at 296. Third, wrongdoers should not be allowed to shift responsibility for their own misconduct. *See, e.g.*, *Miller*, 505 F. Supp. 2d at 28. None of these policy goals would be impaired by CTI's claims.

> **a)** **Allowing Contractual Indemnification Claims Facilitates, Rather Than Inhibits, the Government's Recovery Efforts.**

In enacting the FCA—and in strengthening its civil enforcement provisions in 1986—Congress provided procedures by which courts and the government can manage FCA cases so that the government's ability to prosecute claims expeditiously to recover its alleged losses is effectively unimpaired. *See, e.g.*, 31 U.S.C. § 3730(c)(2). Based on these provisions, courts have barred counterclaims asserted in the underlying *qui tam action* that would impede the government in its pursuit of recovery. *See, e.g.*, *Public Integrity*, 895 F. Supp. at 296 (barring third

party claims in FCA action so as not to interfere with the government's recoupment action by shifting focus to apportionment of fault among co-defendants). These results reflect the principal underlying purpose of the FCA, which is to "recoup the government's losses due to fraud." *Mortgages*, 934 F.2d at 213.

This case poses no such threat. While counterclaims or cross-claims litigated within a *qui tam* action may delay the government's recovery, third-party contractual indemnification claims like CTI's pursued in a *separate* action after the *qui tam* settlement is resolved do not impede the government's pursuit of claims. To the contrary, allowing separate indemnification claims facilitates the government's ability to recover promptly. With knowledge that its liability may be indemnified by contract, a *qui tam* defendant can settle with the government and *then* resolve disputes over relative fault with third parties in a separate proceeding, rather than litigate them in the *qui tam* action. Equally important, just as insurance promotes compensation and settlement of many third-party liabilities, allowing indemnification makes additional funds potentially available for settlement of FCA claims, and will speed and improve the government's recoveries.

In the FCA, Congress expressed no position on whether or how recovery should be apportioned among potentially responsible parties. The government's financial interest in the case ends once it has recouped the funds falsely claimed.

Subsequent indemnification claims do not threaten the government's recovery. By promoting early resolution of FCA claims, contractual indemnification provisions facilitate the government's ability to recoup its alleged losses. Barring all such indemnification claims will complicate and prolong FCA *qui tam* litigation, deter and depress settlements, increase government expense to litigate such cases, and delay recoveries.

**b)**     <u>**Contractual Indemnification Claims Do Not Enable Wrongdoers to Profit.**</u>

Another FCA policy cited by some courts is that FCA "wrongdoers" should be held liable for their actions. *See, e.g.*, *Nardone*, 782 F. Supp. 996; *Kennedy*, 431 F. Supp. at 878. For several reasons, this policy would not be frustrated by allowing CTI's claims to proceed. CTI has not been adjudged to have violated the FCA. In its settlement with the government, CTI expressly disavowed any liability for the claims made by the government in its complaint in intervention. ER 27 ¶¶ H-I; ER 34 ¶ 11. The government could have insisted on an acknowledgment of "wrongdoing," but did not do so. Contrary to the district court's inference that CTI bore some liability, (*see* ER 13), CTI's settlement simply cannot be used as evidence of wrongdoing.

Moreover, as was the case in *Enron*, the government alleged multiple claims that carried different mens rea requirements, but the district court presumed that the settlement was attributable entirely to a single FCA claim. An FCA violation

can only arise where there is knowing and willful misconduct. By contrast, several of the civil theories alleged by the government—such as payment by mistake and negligent misrepresentation—require only that the government prove negligence.[8] Thus, the court cannot presume that the risk of FCA liability was the sole basis for settlement. *See Enron*, 132 F.3d at 529 (where underlying settlement resolved claims related to both negligent and intentional conduct, it is reversible error to presume at the pleading stage that the settlement encompassed only intentional conduct); *see also Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 418 (1969) (noting that for purposes of resolving a motion for judgment on the pleadings in an indemnification case "it must be assumed that Marine Terminals was faultless vis-à-vis Burnside" because the question of Marine Terminals' underlying liability "has not yet been adjudicated and is not before us").

Allowing a civil indemnification action between CTI and Lash will not have the effect of immunizing CTI from allegedly wrongful conduct. Traditional contract and common law affirmative defenses to indemnification actions, developed over many decades, are already in place to ensure that wrongdoers are not rewarded for—or insulated from—their own wrongful conduct through

---

[8] *See United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) (payment by mistake); *Esca Corp. v. KPMG Peat Marwick*, 959 P.2d 651, 654 (Wash. 1998) (negligent misrepresentation).

contractual indemnification. Defenses such as *in pari delicto*, unclean hands, prohibitions against the enforcement of illegal contracts, and principles for performing allocations of fault have been well-honed to produce just and predictable results. Indeed, Lash pled several such affirmative defenses in its answer to CTI's complaint in this case. Allowing these defenses—and other questions of relative liability between CTI and Lash—to be resolved on the merits guarantees fair and equitable results. By contrast, barring all contractual indemnification claims categorically before such questions can be resolved produces unjust results and allows some indemnitors to escape liability for intentional, reckless, or negligent conduct, or violations of law.

Finally, CTI's claim against Lash is premised on Lash's liability for *its own* misconduct, not some theory of vicarious liability for wrongful actions of CTI. CTI's claim *does not* depend on and arise from a judgment that it violated the FCA. In this way, CTI's claims are similar to those at issue in *Marine Terminals*. There, the plaintiff sought indemnification for the defendant's breach of duties *to the plaintiff*, rather than for the parties' respective negligence that created the underlying liability. 394 U.S. at 418. "[Marine Terminals] is not asking Burnside to share responsibility for their joint negligence with respect to McNeill. Rather, the counterclaim . . . is founded . . . on [Burnside's] *independent wrong* to Marine

Terminals." *Id*. (emphasis added).[9]  Similarly, CTI is not seeking damages for "joint negligence" with respect to the government.  Instead, CTI's claims are founded on Lash's independent violations of duty and law.  Excusing Lash from its contractual agreement to indemnify CTI for its failure to adequately perform its contractual and professional duties based on the fortuity of the filing of an FCA action would be a perverse result.

**c)**     **Allowing CTI to Pursue Its Contractual Remedies Promotes the Public Policy in Favor of Enforcing Valid Contracts As Written.**

Washington courts have long construed all contracts, including provisions for indemnification, "'so as to carry out, rather than defeat, the purpose'" of the agreement.  *Nunez v. Am. Bldg. Maint. Co. W.*, 190 P.3d 56, 58 (Wash. Ct. App. 2008) (quoting *Cont'l Cas. Co. v. Mun. of Metro. Seattle*, 405 P.2d 581, 583 (Wash. 1965)).  The role of courts is to construe indemnity clauses in a manner that results in the allocation of risk contemplated and intended by the parties at the time they entered into the agreement.  *Jones v. Strom Constr. Co.*, 527 P.2d 1115, 1117-18 (Wash. 1974).

---

[9] In permitting Marine Terminals' indemnification claim to proceed, the Supreme Court expressly distinguished its previous holding in *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.*, 342 U.S. 282, 285 (1952), in which it refused to "fashion new judicial rules of contribution" between shipowners and contractors.  *Marine Terminals*, 394 U.S. at 417-18.  Thus, the Court recognized that rights of indemnification based on independent wrongs committed by one party against another may proceed even in cases where the Court has previously

-43-

Here, there can be no question that the parties' intention was for Lash to indemnify CTI against *any* liability resulting from Lash's misconduct. The indemnification provision in the service agreement is broad, and covers any potential loss arising out of any willful misconduct, negligent act or omission, breach of any covenant in the contract, falsity of any representation or warranty in the contract, misuse of any confidential information, or violation of any law, rule, or regulation. ER 67 § 8.1. Clearly the acts and omissions by Lash—the failure to properly advise CTI, the falsity of its direct representations to patients and physicians, the failure to meet its contractual representation of expertise, and its breach of contractual duties—would give rise to indemnification for losses to CTI in other contexts. There is no reason to treat losses related to an FCA action differently.

### C. The District Court Erred Because It Did Not Accept CTI's Factual Allegations and It Drew Inferences in Favor of the Moving Party.

The district court's erroneous dismissal resulted in part from several improper factual inferences that were adverse to CTI, inconsistent with the record, and inappropriate at the pleading stage. The district court disregarded the well-established Rule 12(c) standards that all allegations in the complaint *must* be accepted as true and all reasonable inferences *must* be drawn in favor of the non-

---

refused to find an implied right to indemnification or contribution in federal law.

moving party.  *Doyle v. Raley's Inc.*, 158 F.3d 1012, 1014 (9th Cir. 1998); *Enron*, 132 F.3d at 529.  Rather than follow these standards, the district court plainly disbelieved CTI's allegations and drew several inferences *against* CTI.

The most noticeable of these was the district court's inference that CTI had violated the FCA.  CTI has steadfastly and consistently denied all of the government's allegations in the *qui tam* action.  In its Complaint below, CTI disclaimed *any* violation of the FCA, and further alleged that to the extent one could be found, Lash bore the responsibility by virtue of Lash's own acts and conduct.  ER 50-52 ¶¶ 20-28; ER 54 ¶ 34; *see also* ER 27 ¶¶ H-I; ER 34 ¶ 11.  The district court should have accepted these allegations as true in resolving the motion.  Instead, the court essentially made a factual inference to the contrary:

> [W]hile there was no finding that CTI was legally liable for the FCA action, there similarly was no finding that CTI was *not* legally liable. Second, the certainties outweigh the uncertainties:  CTI paid $10.5 million to settle an FCA action in which the government never disavowed its contention that CTI committee fraud; and before the *Marchese* suit and settlement, CTI need not have altered its conduct related to the advertising, marketing, and sales of Trisenox.

ER 13.  Thus, the district court erroneously presumed that by being named a defendant and paying a significant settlement, CTI must have violated the FCA. Neither the fact that a party makes allegations of wrongdoing (even the government has been known to make allegations later proved untrue) nor the fact of settlement supports the court's improper inferences against CTI on a pleadings

motion. Yet, the improper inference that CTI violated the FCA is a thread that runs through most of the Court's erroneous conclusions.

CTI also alleged that the government pled both FCA and non-FCA theories of recovery, including negligent misrepresentation and "payment by mistake," and that its settlement with the government was attributable, in whole or in part, to the non-FCA claims. ER 53-54 ¶¶ 32-33; *see also* ER 28 ¶ 2. As with CTI's allegations regarding liability, the district court should have accepted this allegation as true at the pleading stage. *See also Enron*, 132 F.3d at 529 (reversing judgment on the pleadings because district court erroneously assumed settlement was for knowing and intentional acts when settlement also encompassed claims for negligence and strict liability, and noting that the plaintiff would be entitled at trial "to prove that the claims based on intentional acts were not factors—or were minor factors—in the settlement because they lacked merit"). Instead, the district court essentially presumed that the settlement must be attributable to knowing and willful violations of the FCA:

> Whether whimsical or rational, CTI's motivation for settling the government's FCA claims is not this court's concern. . . . While CTI never admitted to liability, there is no dispute that CTI ceased the purportedly wrongful conduct and the government never disavowed its detailed allegations about CTI's knowing and willful violations of the FCA.

ER 13-14. First, the court's factual recitation was wrong—the Complaint clearly alleges that CTI did not engage in "purportedly wrongful conduct," and that Lash

did, so there is necessarily a dispute whether CTI ever "ceased" unlawful conduct. But setting that error aside, as in *Enron*, the district court erred by assuming the settlement was exclusively motivated by the risk of liability for knowing and willful FCA violations, rather than negligent or simply mistaken conduct not prohibited by the FCA on which the Government had easier burdens of proof.[10] Lash did not argue below and cannot argue here that there exists a legal bar to indemnification for settlements motivated by *non*-FCA risks of liability. The Court's improper inference of fact presumed that the settlement was entirely the product of the government's FCA claims, however.

Similarly, the Court drew factual inferences adverse to CTI concerning its claims for business losses, and dismissed those claims erroneously even though they are unrelated to FCA proceedings or settlement. CTI alleged below that its claim for recovery of business losses were separate and independent from the FCA action, and would have arisen regardless of whether the government pursued claims against CTI. ER 46 ¶ 4; ER 21; ER 110-13. The district court should have

---

[10] Payment by mistake requires "an erroneous belief which was material to the decision to pay," *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970), and negligent misrepresentation requires the failure to "exercise reasonable care or competence in obtaining or communicating . . . information," *Esca Corp. v. KPMG Peat Marwick*, 959 P.2d 651, 654 (Wash. 1998) (internal quotation marks omitted). By contrast, liability under the FCA requires "a palpably false statement, known to be a lie when it is made." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006).

accepted this allegation as true on a Rule 12 motion. Instead, the court made the following findings and inferences contrary to CTI's allegations:

> [T]he $12.3 million in supplemental business damages did not walk into this suit on its own power; the damages rode on the back of the claims for FCA indemnification barred by *Mortgages*. . . . Without the government's investigation, there would have been no consequent business losses.

ER 15. At best, the court's finding that the government's investigation created CTI's business losses, like its other improper factual inferences above, raises a purely factual inquiry that cannot be resolved on a Rule 12 motion. *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th. Cir 1984).

The district court's failure to apply the proper standard to the motion for judgment on the pleadings alone requires reversal. *See Enron*, 132 F.3d at 529. The negative factual inferences were necessary to the court's ultimate legal conclusions. For example, the court's erroneous inference that CTI's business losses arose directly from CTI purportedly ceasing activity in violation of the FCA was necessary to its ultimate conclusion that those business losses were dependent on FCA liability. If the district court had accepted CTI's factual allegations that its business losses resulted from budgeting decisions made in reliance on false assumptions derived from Lash's negligent advice, and not from changes in behavior resulting from the government's investigation, it could have reached no other conclusion but that the damages were independent. The Court rejected CTI's

allegation that it suffered business losses independent of any alleged FCA liability, and then dismissed the complaint with prejudice, depriving CTI of the opportunity to amend its pleading to attempt to state a claim for relief.  ER 110-13; ER 114-15. The district court's denial of leave to amend to see whether CTI could allege a claim for independent damages was also error.  *See infra* § VII.E.

### D. The District Court's Judgment Violated Due Process Because No Court Adjudged CTI to Have Violated the FCA.

In dismissing CTI's claims against Lash, the district court essentially presumed that CTI should be treated as liable under the FCA unless proven otherwise.  The district court held that "while there was no finding that CTI was legally liable for the FCA action, there similarly was no finding that CTI was *not* legally liable."  ER 13.  The district court also intimated that CTI functionally admitted guilt by changing certain business practices because "before the *Marchese* suit and settlement, CTI need not have altered its conduct related to the advertising, marketing, and sales of Trisenox."  *Id*.  Finally, the court pointed out that "the government never disavowed its contention that CTI committed fraud." *Id*.

The district court perfunctorily dismissed CTI's legitimate due process concerns in its order below.  Despite recognizing *Madden*'s express consideration for the due process rights of FCA defendants—particularly those who, like CTI, had never been found liable for violating the FCA—the district court indicated that

-49-

only parties with "independent claims" enjoy the right to due process. *See* ER 12. The effect of the district court's analysis is to deprive parties of their fundamental rights merely because they are named as a defendant in an FCA action. Such a result is wholly inconsistent with all established principles of due process.

Courts have repeatedly recognized that a plaintiff in an indemnification action is entitled to a presumption of innocence until proven otherwise. *See Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 418 (1969) (noting that "at this stage of the case *it must be assumed that Marine Terminals was faultless*" (emphasis added)); *Enron*, 132 F.3d at 529 (plaintiff entitled to prove that its settlement was not attributable to intentional or willful misconduct); *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 831 (9th Cir. 1993) (criticizing the "blanket rule" that forbids counterclaims in *qui tam* actions because it erroneously "presumes that all *qui tam* defendants are liable"). Similarly, accepting the truth of the allegations, the district court was required to presume that CTI did not violate the FCA and was placed at risk of liability principally by its agent Lash, acting as CTI's consulting expert. Dismissing CTI's claims without allowing CTI the opportunity to prove the truth of its allegations at trial impermissibly denied CTI its rights to due process before it was deemed to have violated the law.

**E.  The District Court Erred in Entering Judgment of Dismissal on CTI's Claims for Independent Business Damages That Are Permitted by *Madden*.**

Finally, CTI has stated a valid claim for damages independent of its FCA-related liability.  Lash's negligence and breach of its contractual duties led CTI to overestimate reimbursability—and thus the marketability and commercial value—of Trisenox to its financial detriment.  As a result, CTI incurred business losses, lost opportunities, and increased costs of capital that substantially damaged CTI.  ER 46 ¶ 5; ER 58 ¶ 59.  These damages are wholly independent of the FCA case against CTI, and this Court's case law expressly permits CTI to seek independent damages, even where FCA-related claims may be barred.

In *Madden*, this Court reversed an order dismissing certain counterclaims filed by a defendant against a relator in an FCA action.  4 F.3d at 831.  The *Madden* court noted that counterclaims that were not "dependent on a *qui tam* defendant's liability" were not barred by the FCA and could be asserted by defendants in *qui tam* actions.  *Id*.  This Court was particularly sensitive to the due process concerns identified above, noting that barring all counterclaims created an impermissible presumption that "all *qui tam* defendants are liable."  *Id*.  Under *Madden*, even if certain third-party claims are barred under the FCA, CTI is still entitled to assert claims that do not arise from the imposition of FCA liability against it.

-51-

Courts applying *Madden* have clarified the distinction between dependent and independent claims asserted by FCA defendants. "The simple rule that emerges from these cases is therefore that a claim by an FCA defendant which *requires for its success a finding that the FCA defendant is liable* is the kind of claim barred by the FCA." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 505 F. Supp. 2d 20, 28 (D.D.C. 2007) (emphasis added). The district court below found that CTI's claims for business damages were not independent because "[w]ithout the government's investigation, there would have been no consequent business losses." ER 15. This factual finding is not alleged in the Complaint, has no support in the record, and was contrary to CTI's allegations. When CTI's allegations are properly accepted as true, it is unquestionable that its claims for business damages are independent. At a minimum, the factual issues may not be resolved on a motion under Rule 12(c). *Doleman*, 727 F.2d at 1482 ("Generally, district courts have been unwilling to grant a Rule 12(c) dismissal unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." (internal quotation marks omitted)).

CTI's independent claims arise out of Lash's breach of its professional and contractual duties, and CTI need not be found liable under the FCA in order to recover damages under these claims. CTI explained its business loss claims below:

CTI seeks approximately $12,278,425 in damages caused by Documedics' and Lash's . . . erroneous advice to CTI that Trisenox was reimbursable for off-label uses because it was an orphan drug and because it was "compendia-listed." . . . [W]ith an accurate understanding of the Medicare reimbursement situation for Trisenox, CTI would have modified their sales and marketing plans to reduce expenses in relation to revenues in the period 2002 through 2004, and in light of changes in circumstances as of 2004, including market competition resulting from the FDA's approval of drugs for the treatment of MM and MDS, CTI would have divested Trisenox and related operations no later than December 2004, rather than in July 2005. Under these circumstances, CTI would have avoided the 2005 operating losses from sales of Trisenox of $1,067,000, eliminated 2005 Trisenox non-commercial expenses of $1,946,000, and eliminated Trisenox-related finance expenses that it incurred in 2004 and 2005 in the amount of $9,265,425.

ER 21. CTI proffered an additional description of its business loss claim at the

hearing on Lash's motion:

There are competitive drugs that entered the market in May of 2003, May of 2004 [in] two of our key off-label indications, multiple myeloma and myelodysplastic syndrome. We had built business plans through 2012 in those areas, and all of a sudden at the end of 2004, [notwithstanding] the incorrect advice we had received [from Lash] that those diseases were properly reimbursed, we learned that they were not properly reimbursed.

The company disposed of the drug, made a decision to divest itself of that drug within months because the entire business assumption was vitiated and eliminated. *If we had known that before, if we had never been misled into believing that the drug was properly reimbursed, then in the normal strategic planning the company would have made a decision to divest early in 2004, and that would have occurred six months earlier, and that would have saved twelve million dollars in losses.*

ER 111. In other words, Lash's negligent advice that Medicare should reimburse

for off-label uses of Trisenox led CTI to overestimate the market opportunity of

-53-

Trisenox and delay divestiture of the drug. Had Lash provided non-negligent advice in 2002 that physicians and patients were not entitled to reimbursement for certain off-label administrations, CTI would have estimated the size of the market to be much smaller, and would have reduced its budgeted expenses and disposed of the asset sooner, thus avoiding more than $12 million in business losses suffered from 2002-2006. Instead, beginning in 2002 and continuing through 2005, CTI built infrastructure and incurred capital costs for a patient market that did not exist.

CTI's traditional professional negligence claim in no way depends on any finding of liability for FCA violations. Nevertheless, on the pleadings alone, the district court made significant—and erroneous—factual inferences that CTI's business losses were "dependent" on FCA liability. In fact, there exists no relationship whatsoever between the two. Regardless of whether Lash's erroneous statements about reimbursement for Trisenox ever resulted in FCA violations, they breached the parties' agreement (and Lash's professional duty of care) and caused CTI to make significant business decisions on the basis of erroneous advice.

Under *Madden*, and for purposes of a motion addressed to the pleadings, CTI's settlement of the underlying *qui tam* action should also be considered "independent" from FCA liability. As noted above, the government's complaint in intervention pled several common law tort claims in addition to the FCA claims. To the extent CTI is able to prove that its settlement with the government is

attributable in whole or in part to those *other* claims, they are not liabilities arising from the FCA. Even if this Court disagrees with CTI's construction of the FCA, CTI's right to receive indemnification for funds paid and attorneys' fees incurred to settle non-FCA claims is not dependent on a finding of FCA liability against CTI, and should be honored on a remand.

### F. The District Court Erred by Dismissing the Complaint with Prejudice and Denying Leave to Amend.

Finally, the district court erred in dismissing CTI's independent business damages claims without permitting CTI the opportunity to re-plead. Leave to amend must be freely granted under the Federal Rules and Ninth Circuit law. *See* Fed. R. Civ. P. 15(a)(2); *Lopez v. Smith*, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (reversing for failure to grant leave to amend, and noting that leave must be granted "'if it appears at all possible that the plaintiff can correct the defect'" (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1990))); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "'Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'" *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002)).

As explained above, the district court found that "[w]ithout the government's investigation, there would have been no consequent business losses."

ER 15.  To the extent this finding of fact arose from a lack of specificity in CTI's complaint, CTI should have been allowed to re-plead to more fully delineate the nature of its business damages.  Of course, under well-established Ninth Circuit law, parties need not plead damages with specificity anyway.  *Rental Dev. Corp. of Am. v. Lavery*, 304 F.2d 839, 842 (9th Cir. 1962) (trial court must grant all relief to which a prevailing party is entitled, even if not specifically demanded in the pleadings); *see also* Fed. R. Civ. P. 54(c).  It is sufficient to put a party on notice of the conduct at issue in the case—here, Lash's professional negligence and breach of its contractual duties—to seek recovery for all such losses caused by that conduct.  *Lavery*, 304 F.2d at 842.  Indeed, praying for such other and further relief as the court may deem just and equitable—as CTI did here—is sufficient to preserve a plaintiff's right to recover damages in any amount proven at trial.  *Id.*

In opposing the motion for judgment on the pleadings, CTI requested leave to amend its complaint to specify its damages.  ER 100 (Dkt. 36 at 16 n.15).  The district court's failure to permit such a pleading amendment is reversible error.

## VIII.  <u>CONCLUSION</u>

For the reasons set forth above, the district court's order of judgment on the pleadings should be reversed and this action should be remanded for further proceedings.

Dated:  January 2, 2009          ORRICK, HERRINGTON & SUTCLIFFE LLP


                                        s/Daniel J. Dunne
                         _____
                                        Daniel J. Dunne
                                        Paul F. Rugani
                                   Attorneys for Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,562 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word version 2003 with 14 point font in Times New Roman type style.

Dated:  January 2, 2009        ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                  s/Daniel J. Dunne
                            _____
                                               Daniel J. Dunne
                                               Paul F. Rugani
                                         Attorneys for Appellants

## <u>STATEMENT OF RELATED CASES</u>

Cell Therapeutics, Inc. and the undersigned attorneys are not aware of any related cases currently pending in the United States Court of Appeals for the Ninth Circuit.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 2, 2009, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF System.

Dated: January 2, 2009    ORRICK, HERRINGTON & SUTCLIFFE LLP

s/Daniel J. Dunne

_____

Daniel J. Dunne
Paul F. Rugani
Attorneys for Appellants


**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
719 SECOND AVENUE
SUITE 1000
SEATTLE, WASHINGTON 98104-7097

*tel +1-206-839-4300*
*fax +1-206-839-4301*
WWW.ORRICK.COM

December 17, 2008

Daniel J. Dunne
(206) 839-4395
ddunne@orrick.com

*VIA ELECTRONI MAIL AND U.S. MAIL*

Thomas H. Suddath
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Re: <u>Cell Therapeutics, Inc. v. Lash Group, Inc.</u>
<u>Ninth Circuit Case No. 08-35619</u>

Dear Tom:

As we discussed earlier today, CTI has requested a telephonic 14-day extension of the deadline to file its opening brief in the Ninth Circuit. The request was granted, and the new briefing schedule is as follows: CTI's brief is due January 2, 2009, and Lash's response brief is due February 2, 2009. Our optional reply brief will be due 14 days after you file your response. Pursuant to the Ninth Circuit's rules, this letter will be attached to our opening brief at filing.

Very truly yours,

*Best wishes for the holidays !*

Daniel J. Dunne

Cc: Kelly P. Corr, Corr Cronin Michelson Baumgardner & Preece
Laurie M. Thornton, Corr Cronin Michelson Baumgardner & Preece
Rosalie Euna Kim, Reed Smith LLP
Raymond A. Cardozo, Reed Smith LLP

OHS West:260568544.1